# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 8, 2024

Lyle W. Cayce
Clerk

_____

No. 22-60554

_____

Marta Alicia Mejia-Alvarenga,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A206 007 825

_____

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

The original opinion in this matter was issued by the panel on January 3, 2024. A petition for rehearing *en banc* is currently pending before the court. The petition for *en banc* rehearing is DENIED, no judge in active service having requested that the court be polled. Nevertheless, the panel withdraws our previous opinion, reported at 90 F.4th 348, and substitutes the following:

Marta Alicia Mejia-Alvarenga petitions for review of the Board of Immigration Appeals' denial of her application for asylum. We DENY her

No. 22-60554

petition in part, and we DISMISS her petition in part because we lack jurisdiction.

I

Marta Alicia Mejia-Alvarenga, a native and citizen of El Salvador, was detained while attempting to cross the Rio Grande into the United States near Laredo, Texas.  She was then charged with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) because she did not possess valid documentation at the time of her entry.  She conceded removability as charged.  Mejia-Alvarenga then filed an application with the immigration court for statutory withholding of removal and protection under the Convention Against Torture.[1]  She later amended her application to seek asylum.

Mejia-Alvarenga based her claims for relief on threats that she received from a man named Rigoberto Nelson and others associated with him.  In her application for asylum, Mejia-Alvarenga stated that Nelson raped her while driving her home from a friend's gathering.  She further stated that, immediately after raping her, Nelson threatened to kill Mejia-Alvarenga to prevent her from reporting the rape to the police.  Nevertheless, Mejia-Alvarenga reported the rape to law enforcement.  Shortly after, Nelson was arrested and government officials began his prosecution.

Thereafter, the police sent Mejia-Alvarenga multiple notices to attend court hearings.  After attending two hearings, Mejia-Alvarenga was visited by a series of individuals connected with Nelson who pressured her to drop the case.  First, Nelson's attorney offered Mejia-Alvarenga money to drop the case.  Mejia-Alvarenga reported this to the judge, who removed the attorney from the case.  Then, Nelson's second attorney engaged in the same

---

[1] Mejia-Alvarenga has forfeited any challenge to the denial of CAT relief because she did not raise that issue before the BIA.

2

behavior. Once again, Mejia-Alvarenga reported the behavior to the judge, and the judge removed Nelson's attorney from the case. Thereafter, Nelson's mother and sister began visiting Mejia-Alvarenga and offering her money to drop the case. Mejia-Alvarenga stated that they told her "Rigoberto was going to [be] free[d]" regardless of whether she dropped the case, which frightened her because she perceived it as a threat.

Mejia-Alvarenga further alleged that Nelson sent other men to threaten and intimidate her while he was in jail. For example, Mejia-Alvarenga stated that her friend received a phone call telling the friend to warn Mejia-Alvarenga that she needed to be careful because Nelson had been set free and that "something was going to happen" to her. She also stated that random men, whom she believed to be members of the MS-13 gang with Nelson, began showing up to the stand where she sold fruit to threaten her and to tell her to "be careful." In addition, Mejia-Alvarenga stated that her brother-in-law once found a note next to their home stating that Mejia-Alvarenga should leave if she "owed something" and instructing her not to say anything to the police. Nonetheless, Mejia-Alvarenga reported the note to the police, who stated that they could not do anything because the note was anonymous and did not contain "blood or anything else like that."

Mejia-Alvarenga testified that Nelson made his final threat to her roughly seven years after the rape, when Nelson approached Mejia-Alvarenga and said, "you're going to pay for what you did to me." Mejia-Alvarenga contends that she did not report this threat to the police because she feared for her safety. Instead, she traveled to the United States—first by train and then by crossing the Rio Grande.

II

The immigration judge denied Mejia-Alvarenga's application for relief and ordered her to be removed to El Salvador. While the immigration

judge found Mejia-Alvarenga to be a credible witness and observed that she had suffered past harm rising to the level of persecution, the immigration judge determined that she had not been harmed on account of a political opinion or her membership in a particular social group. The immigration judge also concluded that Mejia-Alvarenga did not establish a well-founded fear of future persecution because she did not show that the government would be unable or unwilling to control a future persecutor.

Mejia-Alvarenga appealed this decision to the BIA. In addition, she filed a motion asking that the BIA refer her appeal to a three-member panel and seeking summary reversal and remand. In a reasoned order, a single-member panel of the BIA affirmed the immigration judge's decision and denied Mejia-Alvarenga's motion. With respect to her application for asylum and withholding of removal, the BIA determined that Mejia-Alvarenga failed to show that Salvadoran authorities were unable or unwilling to protect her. The BIA's order also rejected Mejia-Alvarenga's arguments that her due process rights were violated; that her appeal should be granted because the government did not file a brief; and that the immigration judge was biased, applied the wrong burden of proof, and overlooked material evidence. Finally, the BIA responded to Mejia-Alvarenga's motion seeking referral to a three-member panel. In doing so, the BIA ruled that it lacked authority to review challenges to its regulatory referral procedures and that the appeal otherwise did not require a three-member panel under 8 C.F.R. § 1003.1(e)(6). Mejia-Alvarenga filed a timely petition for review in this court.

## III

We review the BIA's factual findings under the substantial evidence standard and its legal conclusions *de novo*. *Bertrand v. Garland*, 36 F.4th 627, 631 (5th Cir. 2022). Where the immigration judge's decision impacted the

BIA—as is the case here—we consider the immigration judge's decision to the extent it influenced the BIA. *Hernandez-Castillo v. Sessions*, 875 F.3d 199, 204 (5th Cir. 2017).

## IV

Mejia-Alvarenga contends that the BIA erred in denying her relief because: (1) her petition for asylum established that the Salvadoran government was unable or unwilling to protect her from private persecutors; (2) the BIA adjudicator failed to act as an impartial adjudicator in violation of 8 C.F.R. § 1003.1(d)(1); (3) the BIA violated her constitutional rights when it allowed a single BIA member to render its decision, without referral to a three-member panel; and (4) the BIA committed an abuse of discretion by not referring her case to a three-member panel pursuant to 8 C.F.R. § 1003.1(e)(6).

## A

We begin by considering whether the BIA erred when it determined that Mejia-Alvarenga failed to establish that the Salvadoran government was unable or unwilling to protect her from private persecutors, as would be required for her to obtain asylum. We hold that it did not.

To be eligible for asylum, an applicant must establish that she is a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). To qualify as a refugee, the applicant must show that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." *Id.* "Persecution refers to harm inflicted either by the government or by private actors whom the government 'is unable or unwilling to control.'" *Bertrand*, 36 F.4th at 631 (quoting *Sanchez-Amador v. Garland*, 30 F.4th 529, 533 (5th Cir. 2022)). To prove that a government is unable or unwilling to protect against private persecution, an applicant for asylum "must show that the government

condoned the private violence 'or at least demonstrated a complete helplessness to protect the [applicant.]'" *Id.* at 631–32 (quoting *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006)). The BIA appropriately applied this standard when determining whether the Salvadoran government would be unwilling or unable to control Mejia-Alvarenga's persecutors.

Although Mejia-Alvarenga argues that the "complete helplessness" standard is inapposite because it was adopted in *Matter of A-B-*, 27 I&N Dec. 316, 337 (A.G. 2018) (*A-B-I*), which has since been vacated by *Matter of A-B-*, 28 I&N Dec. 307 (A.G. 2021) (*A-B-III*), our precedent forecloses that argument. *Bertrand* 36 F.4th at 632 n.5. Indeed, our court has held that the "inability or unwillingness" standard is interchangeable with our "complete helplessness standard," and therefore does not conflict with the Attorney General's decision in *A-B-III*. *Gonzales-Veliz v. Barr*, 938 F.3d 219, 233 (5th Cir. 2019). Thus, because the complete helplessness standard was unambiguously the correct standard prior to *A-B-I*, it continues to serve as the law of this circuit even after the vacatur in *A-B-III*. *Bertrand*, 36 F.4th at 632–33; *see also Nat'l Cable Telecomm. Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior decision holds that its construction follows from the unambiguous terms of the statute."). In addition, the standard that Mejia-Alvarenga proposes—that she must prove that there is at least a ten percent chance that the Salvadoran government is unable or unwilling to protect her from her persecutors—is without support. Mejia-Alvarenga cites *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987), in support of her claim. However, *Cardoza-Fonseca* is inapposite here because that case did not concern the element of a government's ability or willingness to protect against private persecution. Instead, *Cardoza-Fonseca* evaluated what is required to establish a "well-founded fear of persecution." *Id.*

Mejia-Alvarenga further argues that the BIA failed to show meaningful consideration of the relevant substantial evidence supporting her claims because its decision focused on persecution by Nelson alone and did not address the Salvadoran government's ability and willingness to protect her from the MS-13 gang. A decision by the BIA is deficient if it fails to reflect "meaningful consideration of the relevant substantial evidence supporting [an] alien's claims." *Ndifon v. Garland*, 49 F.4th 986, 988 (5th Cir. 2022) (quoting *Abdel-Masieh v. INS*, 73 F.3d 579, 585 (5th Cir. 1996)). The BIA is not required to "write an exegesis on every contention," but it must consider the issues raised before it and provide a decision "sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Ghotra v. Whitaker*, 912 F.3d 284, 290 (5th Cir. 2019) (citation omitted).

We hold that the BIA did not err in deciding that Mejia-Alvarenga failed to show that the Salvadoran government would be unable or unwilling to control Mejia-Alvarenga's persecutors because the BIA adequately considered evidence of gang involvement in Mejia-Alvarenga's claims, and substantial evidence supports the BIA's determination. The evidence presented to the BIA showed that the Salvadoran government arrested and detained Nelson for the alleged rape; removed his first two attorneys after Mejia-Alvarenga reported them to the court for offering her money to drop the case; and pursued Nelson's case even after Mejia-Alvarenga stopped cooperating with the prosecution. These actions support the BIA's determination that the Salvadoran government would not be unwilling or unable to control Mejia-Alvarenga's persecutors.

Mejia-Alvarenga also presented evidence that the Salvadoran government did not make an effort to address threats from random men at Mejia-Alvarenga's fruit stand, Nelson's May 2013 in-person threat, or the nonspecific threat made on a note left at Mejia-Alvarenga's house in May

2013. However, a reasonable factfinder could still conclude that substantial evidence supported the determination that the Salvadoran government would not be unwilling or unable to control Mejia-Alvarenga's persecutors. Indeed, Mejia-Alvarenga did not report the first two of these threats to authorities, therefore depriving them of the opportunity to address those threats. Thus, "one would be hard-pressed to find that the authorities were unable or unwilling" to protect her from those threats. *Sanchez-Amador*, 30 F.4th at 534. Further, given the lack of specificity of the threat conveyed by the note and the fact that there is no evidence as to who was responsible for the note, it was reasonable for the BIA to conclude that Mejia-Alvarenga did not present compelling evidence that the Salvadoran government was unable or unwilling to protect Mejia-Alvarenga from gangs. "A government is not 'unable or unwilling' to protect against private violence merely because it has difficulty solving crimes or anticipating future acts of violence." *Bertrand*, 36 F.4th at 632.

B

We next consider whether the BIA violated its regulatory obligation to be impartial under 8 C.F.R. § 1003.1(d)(1). Mejia-Alvarenga contends that the BIA failed to act as an impartial appellate body when the BIA adjudicator did not require DHS to file briefing and instead "*sua sponte* decide[d]" issues "on DHS's behalf." However, there is no authority requiring either party to file briefing before the BIA, and Mejia-Alvarenga's argument is otherwise legally insufficient to prove bias.

Mejia-Alvarenga grounds her claim concerning the BIA's failure to act as an impartial appellate body in 8 C.F.R. § 1003.1(d)(1), which requires the BIA to function as such. However, this argument is unavailing. The decision not to require the government to file briefing is consistent with the regulations governing appeals before the BIA. Under the regulations,

"[b]riefs may be filed by both parties." 8 C.F.R. § 1003.38(f). Thus, the regulations allow even the appealing party to forgo filing a brief in the BIA, so long as the party identifies the reasons for the appeal when filing the notice of appeal. *See* 8 C.F.R. § 1003.3(b). It follows that the single BIA member's decision not to require the government to file a brief complies with the regulations.

Further, even if we were to construe Mejia-Alvarenga's argument as a due process concern—instead of one grounded in the Attorney General's regulations—Mejia-Alvarenga has still failed to present evidence in support of her position that the BIA member demonstrated partiality by not requiring the government to file a brief. *See Wang v. Holder*, 569 F.3d 531, 540 (5th Cir. 2009) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the . . . proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." (alterations in original) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994))).

## C

Next, we consider Mejia-Alvarenga's argument that the BIA violated her due process rights when it allowed a single BIA member to render its decision, without referral to a three-member panel. We reject this claim.

Mejia-Alvarenga argues that the regulation governing decisions by a single BIA member, 8 C.F.R. § 1003.1(e), is unconstitutional because it "virtually preclude[s] reversal of immigration judges' removal orders even when meritorious issues are raised." While Mejia-Alvarenga correctly asserts that single-member BIA panels do not have the authority to reverse an immigration judge's decision unless reversal is plainly consistent with and required by an intervening change in law, *see* 8 C.F.R. § 1003.1(e)(5),

(e)(6)(vi), this feature of the BIA's case management system does not violate due process for two independent reasons.

First, under the statutory scheme, referral to a three-member BIA panel is discretionary. As our precedent clearly states, "the failure to receive relief that is purely discretionary in nature does not amount to a deprivation of a liberty interest." *Ramos-Portillo v. Barr*, 919 F.3d 955, 963 (5th Cir. 2019) (quoting *Assaad v. Ashcroft*, 378 F.3d 471, 475 (5th Cir. 2004)). "[T]he denial of discretionary relief does not rise to the level of a constitutional violation even if [the moving party] had been eligible for it." *Ramos-Portillo v. Barr*, 919 F.3d at 963 (alterations in original) (quoting *Altamirano-Lopez v. Gonzales*, 435 F.3d 547, 550 (5th Cir. 2006)). Because referral to a three-member BIA panel is discretionary, Mejia-Alvarenga has no liberty interest at stake.

Alternatively, we hold that there is no due process violation because the agency has discretion to fashion its own rules of procedure.[2] As the Supreme Court has stated, when Congress entrusts executive agencies with the responsibility to conduct their own proceedings—as it has done in the immigration context—it "intend[s] that the discretion of [these] agencies and not that of the courts be exercised in determining" whether to provide procedural rights beyond those that Congress expressly granted in the authorizing statute. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 546 (1978) (emphasis omitted). Thus, because Congress has given the BIA the responsibility to conduct its own proceedings, the agency "should be free to fashion [its] own rules of procedure and to pursue methods of inquiry capable of permitting [it] to discharge [its] multitudinous

---

[2] Alternative holdings are not dicta and are binding in this circuit. *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016).

duties." *Soadjede v. Ashcroft*, 324 F.3d 830, 832 (5th Cir. 2003) (quoting *Albathani v. INS*, 318 F.3d 365, 376 (1st Cir. 2003)).

In addition, we also reject Mejia-Alvarenga's argument on the merits.[3] Mejia-Alvarenga argues that New Orleans's 10% asylum grant rate, when compared with New York and Honolulu's grant rates of 43% and 60% respectively, establishes bias. However, we have already rejected this argument. *See Singh v. Garland*, 20 F.4th 1049, 1054–55 (5th Cir. 2021) (addressing a challenge to an immigration judge's impartiality). The rate at which immigration judges in a particular location grant asylum at most provides a "crude summation" of aggregated decisions in prior cases. *Id.* at 1055. The "raw statistic" does not support finding a denial of due process as to the § 1003.1(e) standards. *Id.*

## D

Finally, we consider Mejia-Alvarenga's argument that the BIA committed an abuse of discretion by not referring her case to a three-member BIA panel pursuant to § 1003.1(e)(6). We hold that we lack jurisdiction over this claim. Judicial review under the APA is not available for agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985). This means that the court shall not review an agency action if the law governing the action "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830; *see Qorane v. Barr*, 919 F.3d 904, 911–12 (5th Cir. 2019) (applying § 701(a)(2) to conclude that jurisdiction does not exist to review the BIA's denial of a *sua sponte* regulatory reopening under 8 C.F.R. § 1003.2(a)); *cf. Hernandez-Castillo*, 875 F.3d at

---

[3] Alternative holdings are not dicta and are binding in this circuit. *Texas v. United States*, 809 F.3d at 178 n.158, *aff'd by an equally divided Court*, 579 U.S. 547 (2016).

No. 22-60554

207–08 (holding that the BIA's discretionary denial of a motion to administratively close proceedings is subject to judicial review because there are meaningful standards for evaluating when administrative closure is appropriate).  Because the BIA has not articulated standards for evaluating when and how single-member BIA panels should exercise their discretion to refer a case to a three-member panel under § 1003.1(e)(6), we lack jurisdiction over Mejia-Alvarenga's claim.[4]  *See Qorane*, 919 F.3d at 912.

V

We DENY Mejia-Alvarenga's petition as to the first three issues and DISMISS her petition on the abuse of discretion issue for lack of jurisdiction.

---

[4] The government also argues that our reasoning from two earlier decisions provides support for our decision today.  In *Tibakweitira v. Wilkinson*, we stated that "[b]ecause the decision to designate the case to be heard by a three-member panel is discretionary, this court lacks jurisdiction to review the BIA's decision." 986 F.3d 905, 914 (5th Cir. 2021) (quoting *Cantu-Delgadillo v. Holder*, 584 F.3d 682, 690–91 (5th Cir. 2009)). While *Tibakweitira* and *Cantu-Delgadillo* could provide support for our holding here, the government correctly points out that those cases also involved the application of 8 U.S.C. § 1252's jurisdictional bar, which is not at issue in this case.  Here, by contrast, we lack jurisdiction to review the BIA's decision not to refer a case to a three-member panel under § 1003.1(e)(6) without reliance on § 1252's jurisdictional bar.