# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 19, 2024

Lyle W. Cayce
Clerk

————————

No. 22-60479

————————

Sandra Beatriz Bustamante-Leiva; Jayco David Jovel-Bustamante; Jean Carlos Jovel-Bustamante; Jonathan Josue Jovel-Bustamante,

*Petitioners*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

————————————————————

Petition for Review of an Order of the
Board of Immigration Appeals
Agency Nos. A208 173 147,
A208 173 149, A208 173 150,
A208 173 151

————————————————————

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Sandra Beatriz Bustamante-Leiva, and her three children (Jean Carlos Jovel-Bustamante, Jayco David Jovel-Bustamante, and Jonathan Josue Jovel-Bustamante) petition for review of the Board of Immigration Appeals' denial of their applications for asylum, statutory withholding of removal under 8 U.S.C. § 1231(b)(3), and protection of removal under the Convention Against Torture. We DENY their petitions.

No. 22-60479

I

Bustamante-Leiva and her three children are natives and citizens of Honduras. Each was served a notice to appear after entering the United States illegally near Hildalgo, Texas. Petitioners were then charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i) because they did not possess valid documentation at the time of entry. Petitioners conceded removability as charged. Bustamante-Leiva then applied for asylum, withholding of removal, protection under the Convention Against Torture, and humanitarian asylum, with the children as riders to her application.

Petitioners based their claims for relief on claims of persecution on account of religion, political opinion, and membership in a particular social group. In doing so, Petitioners proposed five particular social groups: (1) "unprotected Honduran [w]omen who are viewed as property and subordinate to the male dominated gangs"; (2) "unprotected Honduran [w]omen who are unable to protect themselves or [t]heir children from Honduran gangs"; (3) "Honduran [w]omen, who are involved in religious activities and a church that strives to proselytize and convert teenagers from joining gangs, and who are unable to protect themselves or their children from Honduran gangs"; (4) "a [f]amily that is headed by an unprotected Honduran [w]oman who is unable to protect herself and her family, including children, from the Honduran [g]angs itself and the children from Honduran gangs"; and (5) "Honduran witnesses to witness Honduran gang violence and threats." The application was supported by Bustamante-Leiva's testimony and written declaration. It was also supported by the testimony of her son, Jean Carlos; testimony from experts Arlee Pugh and Dr. Thomas Boerman; and documentary evidence.

Bustamante-Leiva based her claims for relief on the following facts: Beginning around 2012, gang members used an empty lot adjacent to the back

2

of Bustamante-Leiva's home to torture, kill, and bury gang victims. Bustamante-Leiva stated that the screaming from gang victims was audible in her home and that smells from the events carried through the walls. Because the family felt unsafe in this neighborhood but lacked the financial resources to leave, Bustamante-Leiva's husband left the family to earn money in the United States. He made this decision with the goal of earning enough money for the family to move.

At the end of 2012, Bustamante-Leiva heard that the gang would begin recruiting children as young as twelve. Having sons within this age range, Bustamante-Leiva fled to a city about an hour away with her sons and mother. Shortly thereafter, Bustamante's oldest son, Jorge, told his mother that he was going to go to the United States to help his father earn money. Unfortunately, however, Jorge was killed during his travels in a train accident in Mexico. Bustamante-Leiva's next oldest son, Jean Carlos, later informed Bustamante-Leiva that the true reason Jorge left for the United States was because gang members were trying to recruit him.

Bustamante-Leiva and her remaining children lived in the new city without issue until April 2015, when a gang member called her and demanded money. The gang member told Bustamante-Leiva that the gang was watching her, knew that she lived with only her children and mother, knew when and where her son Jean Carlos went to school, and knew that her husband was in the United States. The gang member demanded that she give the gang a sum of money, which would increase each day that she did not comply. The gang member then threatened to "chop up [her son] into little pieces" and kill the rest of the family if she refused to pay.

In response to the threats, Bustamante-Leiva consulted her pastor, and the pastor and two of his family members went to Bustamante-Leiva's house, where they all prayed together. Bustamante-Leiva stated that she

received another call from the gang as the group was praying, and she left the phone on so that the caller could hear their audible prayers. She continued to get threatening text messages from the gang, and the pastor advised her to disable her phone and flee.

After receiving the pastor's advice, Bustamante-Leiva left with her children and mother for a family member's house in another city. Petitioners stayed with the family member for one week, until the family member began to fear for her own safety and asked Bustamante-Leiva to leave. At that point, Bustamante-Leiva and her children left for the United States. Bustamante-Leiva reported that another family member helped her, the children, and her mother travel until they reached Mexico. After entering the United States, Bustamante-Leiva learned that the family member who had helped her was killed near his house by gang members for helping the family flee Honduras.

Pugh, a licensed professional counselor, was accepted as an expert on mental health diagnoses and testified that Bustamante-Leiva suffered from post-traumatic stress disorder and adjustment disorder with mixed anxiety and depression. The Petitioners offered Dr. Boerman as an expert on gangs in Honduras, and he testified on that topic.

II

The immigration judge denied all requested relief and ordered that Petitioners be removed to Honduras.

On appeal, the BIA upheld the immigration judge's findings that Petitioners did not show harm rising to the level of persecution, did not show a nexus between the harm and a protected ground, and did not establish a cognizable particular social group. Regarding their failure to establish a cognizable particular social group, the BIA determined that the Petitioners failed to establish the requisite social distinction with respect to their first four proposed particular social groups and that the final proposed particular

social group, Honduran witnesses to gang violence and threats, was not cognizable because it lacked the requisite particularity. In addition, the order rejected due process arguments made by Petitioners and denied their request for a three-member panel as moot. Petitioners then filed a timely petition for review in this court. 8 U.S.C. § 1252(b)(1).

### III

We review factual findings under the substantial evidence standard and its legal conclusions *de novo*. *Bertrand v. Garland*, 36 F.4th 627, 631 (5th Cir. 2022). Where the immigration judge's decision impacted the BIA—as is the case here—we consider the immigration judge's decision to the extent it influenced the BIA. *Hernandez-Castillo v. Sessions*, 875 F.3d 199, 204 (5th Cir. 2017).

### IV

Petitioners contend that the BIA erred in denying their relief because: (1) substantial evidence does not support the BIA's determination that Petitioners failed to show membership in a cognizable particular social group; (2) substantial evidence does not support the BIA's determination that Petitioners failed to demonstrate the requisite nexus between their harm and religion; (3) the BIA violated Petitioners' constitutional rights when it allowed a single BIA member to render its decision, without referral to a three-member panel; and (4) the BIA adjudicator failed to act as an impartial adjudicator in violation of 8 C.F.R. § 1003.1(d)(1).

### A

We begin by considering whether the BIA erred when it determined that Petitioners failed to show membership in a cognizable particular social group. We hold that it did not.

To be eligible for asylum, an applicant must show, among other things, that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). To be cognizable, a particular social group must be comprised of persons who share an immutable characteristic that is particularly defined and socially distinct within the society at issue. *See Gonzales-Veliz v. Barr*, 938 F.3d 219, 229 (5th Cir. 2019). A group's "immutable characteristics must make the group sufficiently particularized and socially distinct without reference to the very persecution from which its members flee." *Jaco v. Garland*, 24 F.4th 395, 407 (5th Cir. 2021). Social distinction "is determined by 'the extent to which members of a society perceive those with the characteristic in question as members of a social group.'" *Hernandez-De La Cruz v. Lynch*, 819 F.3d 784, 786 (5th Cir. 2016) (quoting *Orellana-Monson*, 685 F.3d 511, 519–20 (5th Cir. 2012)). While Petitioners identified five proposed particular social groups before the immigration judge, they only raise two on appeal: (1) "unprotected Honduran [w]omen who are unable to protect themselves or [t]heir children from Honduran gangs;" and (2) "a [f]amily that is headed by an unprotected Honduran [w]oman who is unable to protect herself and her family, including children, from the Honduran [g]angs itself and the children from Honduran gangs."

The law of this circuit squarely supports the BIA's conclusion that the two proposed particular social groups on appeal are not cognizable due to lack of social distinction. In *Suate-Orellana v. Barr*, this Court held that "Honduran women who have been targeted for and resisted gang recruitment after the murder of a gang-associated partner" lacked the necessary social distinction to qualify as a particular social group. 979 F.3d 1056, 1061 (5th Cir. 2020). Similarly, in *Jaco*, the Court held that "Honduran women who are unable to leave their domestic relationships" did not make

up a particular social group because the proposed group also lacked an independent social distinction in the community. *Jaco*, 24 F.4th at 402, 407. Just as the proposed particular social groups in those cases lacked the independent social distinction necessary to form cognizable particular social groups, Petitioners' proposed particular social groups fall short.

Indeed, testimony by Petitioners' own expert witness supports this holding. While Petitioners allege that Dr. Boerman's testimony before the immigration judge adequately supports their position that the proposed particular social groups described a socially distinct group in Honduras, Dr. Boerman's testimony indicated that violence by gangs against women in Honduras was generally subsumed by the larger phenomenon of gang violence. Specifically, Dr. Boerman stated that gang violence against women was "treated essentially as an invisible phenomenon" and that there were "no specialized programs of any sort to protect women at risk, and it's just kind of lost in the shuffle of the larger phenomenon of violence." In other words, Dr. Boerman's testimony goes to show that the proposed particular social groups are not perceived as socially distinct in the community. It follows that nothing in the record compels the conclusion that the members of Petitioners' two proposed particular social groups are perceived substantially differently in Honduras from the general Honduran population who are targeted or harmed by gang members. *See Suate-Orellana*, 979 F.3d at 1061.

To the extent that Petitioners attempt to rely on a broader variation of their proposed particular social groups than what they raised before the immigration judge, we reject that attempt. Petitioners assert that the operative language in the definitions of their two proposed particular social groups is: (1) "unprotected Honduran women [and] children;" and (2) "a family that is headed by an unprotected Honduran woman [who has] children." Petitioners then contend that a mother and her children are a self-

evident group whose social distinction is recognized by society almost universally. According to Petitioners, the remaining language of their proposed particular social groups is harmless surplusage that merely repeats the persecutory conduct that must be proven.

However, the "operative language" that Petitioners seek to rely on when making this argument is similar to the language used in the reformulated particular social groups definitions that Petitioners proposed to the BIA and that the BIA refused to consider. In deciding to reject the Petitioners' reformulated particular social groups, the BIA stated that Petitioners' newly articulated particular social groups would not be addressed because they were not advanced before the immigration judge. *Id.* This decision by the BIA is consistent with our precedent. The BIA need not consider a claim or issue raised for the first time on appeal, including a reformulated particular social group. *See Jaco*, 24 F.4th at 402; *Cantarero-Lagos v. Barr*, 924 F.3d 145, 150-54 (5th Cir. 2019). Thus, because a particular social group consisting simply of "unprotected Honduran women with children" was not raised before the immigration judge, the BIA was permitted to decline to address it. *See Jaco*, 24 F.4th at 402; *Cantarero-Lagos*, 924 F.3d at 150–54. Given the BIA's refusal to address Petitioners' refined particular social groups, this court's consideration of the proposed particular social group here would be improper.

B

Second, we consider whether the BIA erred when it determined that Petitioners failed to establish past persecution or a well-founded fear of persecution on account of religion. We hold that it did not, as the evidence presented to the BIA does not compel the conclusion that religion was a central reason for the gang's purported persecution of Petitioners.

In arguing that they are eligible for asylum because they came to the United States to flee religious persecution, Petitioners rely on Bustamante-Leiva's testimony that she was heavily involved in her church and made efforts to convert young people in order to deter them from joining gangs. Petitioners further rely on Bustamante-Leiva's testimony that she left the phone on so that the gang could hear her praying with others when the gang first called and threatened her family, and on Dr. Boerman's testimony that gangs tend to target church members for being outspoken opponents of gangs. However, this evidence does not compel the conclusion that religion was a central reason for the harm by the gang. *See Shaikh v. Holder*, 588 F.3d 861, 864 (5th Cir. 2009). As we have recognized, "a statutorily protected ground need not be the only reason for harm, [but] it cannot be incidental, tangential, superficial, or subordinate to another reason for harm" for a petitioner to obtain asylum on the basis of religious persecution. *Id.* (quoting *Matter of J-B-N & S-M-*, 24 I.&N. Dec. 208, 212 (BIA 2007)).

To the extent religion played any role in the harm to Petitioners, it was at most incidental to the gang's goal of economic extortion. *See Shaikh*, 588 F.3d at 864. This is evident from the fact that the praying that the gang might have heard through the phone occurred after the gang already initiated its extortion demands and death threats. In addition, Bustamante-Leiva's testimony indicated that she did not have any issues with gangs directly related to her church involvement. In light of these facts, and because substantial evidence only requires "that the BIA's decision be supported by record evidence and be substantially reasonable," we hold that substantial evidence supports the BIA's determination that Petitioners failed to show past persecution or a well-founded fear of persecution based on religion. *Omagah v. Ashcroft*, 288 F.3d 254, 258 (5th Cir. 2002).

C

No. 22-60479

Next, we consider Petitioners' argument that the BIA violated their due process rights when it allowed a single BIA member to render its decision, without referral to a three-member panel. Petitioners' due process arguments are identical to those made by another petitioner in a recently decided case, *Mejia-Alvarenga v. Garland*, 95 F.4th 319, 326–27 (5th Cir. 2024). Just as we did in that case, we reject Petitioners' claim.

Specifically, Petitioners argue that the regulation governing decisions by a single BIA member, 8 C.F.R. § 1003.1(e), is unconstitutional because it precludes reversal of immigration judges' removal orders even when meritorious issues are raised. While Petitioners correctly assert that single-member BIA panels do not have the authority to reverse an immigration judge's decision unless reversal is plainly consistent with and required by an intervening change in law, *see* 8 C.F.R. § 1003.1(e)(5), (e)(6)(vi), this feature of the BIA's case management system does not violate due process. *Mejia-Alvarenga*, 95 F.4th at 326.[1]

D

Finally, we consider whether the BIA violated its regulatory obligation to be impartial under 8 C.F.R. § 1003.1(d). Petitioners contend that the BIA failed to act as an impartial appellate body when the BIA adjudicator did not require DHS to file briefing and instead "*sua sponte* decide[d]" issues "on DHS's behalf." However, there is no authority requiring either party to file briefing before the BIA, and Petitioners' argument is otherwise legally insufficient to prove bias.

---

[1] To the extent that Petitioners argue that the BIA also committed an abuse of discretion by not referring her case to a three-member BIA panel pursuant to § 1003.1(e)(6), we do not have jurisdiction over that claim for the reasons articulated in *Mejia-Alvarenga*. 95 F.4th at 327.

No. 22-60479

Petitioners ground their claims concerning the BIA's failure to act as an impartial appellate body in 8 C.F.R. § 1003.1(d)(1), which requires the BIA to function as such. However, this argument is unavailing. As we recently held in *Mejia-Alvarenga*, the decision not to require the government to file briefing is consistent with the regulations governing appeals before the BIA. 95 F.4th at 325. Under the regulations, "[b]riefs may be filed by both parties." 8 C.F.R. § 1003.38(f). Thus, the regulations allow even the appealing party to forgo filing a brief before the BIA, so long as the party identifies the reasons for the appeal when filing the notice of appeal. *See* 8 C.F.R. § 1003.3(b). It follows that the single BIA member's decision not to require the government to file a brief complies with the regulations.

Further, even if we were to construe Petitioners' argument as a due process concern—instead of one grounded in the Attorney General's regulations—Petitioners have still failed to present evidence in support of their position that the BIA member demonstrated partiality by not requiring the government to file a brief. *Mejia-Alvarenga*, 95 F.4th at 326 (citing *Wang v. Holder*, 569 F.3d 531, 540 (5th Cir. 2009)).

V

For these reasons, we DENY the petition.

11